UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

In re                                                :        Chapter 11
                                                     :
        Defined Diagnostics, LLC,[1]                 :        Case No. 16-_____ (      )
                                                     :
                        Debtor.                      :
-------------------------------------------------------x

### DECLARATION OF NADINE H. WOHLSTADTER, MANAGING MEMBER OF DEFINED DIAGNOSTICS, LLC, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

        I, NADINE H. WOHLSTADTER, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

        1.        My husband, Samuel J. Wohlstadter, and I are the managing members of, and wholly own the membership interests in, Defined Diagnostics, LLC (f/k/a Wellstat Diagnostics, LLC) (the "**Debtor**"), a company dedicated to the development, and future manufacture, sale, and distribution of small, point of care, diagnostic systems that can perform a wide variety of tests targeting the clinical diagnostics market.  In my capacity as managing member of the Debtor, I have firsthand knowledge of the Debtor's operations and financial circumstances.

        2.        On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtor intends to continue in the possession of its property and the management of its business as debtor in possession following turnover of such property currently within the possession and control of a receiver pursuant to section 543 of the Bankruptcy Code.

---

[1]        The last four digits of the Debtor's taxpayer identification number are 0344.  The Debtor's offices are located at 930 Clopper Road, Gaithersburg, Maryland 20878.

3.     Mr. Wohlstadter and I also own, either directly or indirectly, the following non-debtor companies: Wellstat Management Company, LLC, Wellstat Biologics Corporation, Wellstat Therapeutics Corporation, Wellstat Ophthalmics Corporation, Wellstat Vaccines, LLC, Wellstat Immuno Therapeutics, LLC, Wellstat Biocatalysis, LLC, and Wellstat AVT Investment LLC (collectively referred to as the "**Wellstat Affiliates**").  A diagram illustrating the corporate structure of the Debtor and the Wellstat Affiliates is annexed hereto as Exhibit L.  In addition, we also own and control Hyperion Catalysis International, Inc., which manufactures and sells advanced materials unrelated to the healthcare activities of the Debtor or the Wellstat Affiliates.

## BACKGROUND

4.     The Debtor and the Wellstat Affiliates were established to improve the lives of patients and expand the frontiers of medicine by developing, manufacturing, selling, and distributing diagnostic systems, vaccines, and treatments for a wide variety of serious and sometimes life-threatening diseases.  These include, among other diseases, cancer, hereditary orotic aciduria, gout, mitochondrial disease, neurodegenerative diseases, age-related macular degeneration, hereditary retinitis pigmentosa, and certain inflammatory and autoimmune diseases.

5.     The Debtor and the Wellstat Affiliates focus on research and development of life-saving drugs and medical technology.  Therefore, they do not generate regular revenue, but only generate income when the products they develop are approved (or appear likely to be approved) by the U.S. Food and Drug Administration (the "**FDA**").

6.     For example, on December 11, 2015, the FDA approved the use of Vistogard (uridine triacetate), a chemotherapy overdose rescue antidote drug which was developed by Wellstat Therapeutics Corporation ("**Wellstat Therapeutics**"), one of the Wellstat Affiliates.  Specifically, Vistogard is a medication which is taken orally to prevent cell damage

and cell death caused by a certain type of chemotherapy that has been used for decades to treat various types of cancer, including breast and gastrointestinal cancers.  An overdose of this type of chemotherapy can include serious consequences for the patient, including death.  The FDA approval of Vistogard followed two separate trials involving adult and pediatric cancer patients which had received an overdose of these types of chemotherapies or had early-onset severe or life-threatening toxicity as a result of receiving these types of chemotherapies.

7.      Similarly, on September 4, 2015, the FDA approved the use of Xuriden, the first FDA-approved treatment for patients suffering from hereditary orotic aciduria, which is a rare pediatric metabolic disorder which is potentially life-threatening.  Prior to the development of Xuriden, patients with this disorder had no other treatment options.  Xuriden was developed by Wellstat Therapeutics, and was approved by the FDA following an expedited trial process. Xuriden is now commercially available.

8.      For many years, Mr. Wohlstadter and I have funded the Debtor and the Wellstat Affiliates' research and development efforts with over $450 million in loans because of our belief in the companies' missions.  The above examples of recent FDA approvals of drugs developed and marketed by the Wellstat Affiliates are just a sampling of the breakthroughs in medical treatment and technology developed as a result of the Wellstat Affiliates' various research and development.

9.      By mid-2012, the Debtor had made great strides in developing an instrument and cartridge system as well as several distinct diagnostic assays[2] to run on the system, including what was expected to be the first to market real-time point of care test to measure how much of a certain chemotherapy drug remains in a patient's system.  Before that

---

[2]      An "assay" is an investigative procedure in laboratory medicine or pharmacology for assessing or measuring the presence or amount of a particular target, such as a drug or biochemical substance.

time, testing for that chemotherapy drug took up to a week, during which time patients could

potentially be lethally overdosed or overexposed.  In addition, the Debtor was developing a

Lyme disease assay, a methotrexate overexposure assay, and two hemophilia assays to run on its

diagnostic system.

10.     One of the Debtor's primary assets is its License Agreement with

BioVeris Corporation, dated June 27, 2007 (the "**ECL License**"), granting the Debtor rights to

use certain patented electrochemiluminescense technology (the "**ECL Technology**").  The

Debtor's technology platform is based upon the ECL Technology, which is a detection system

originally developed by a predecessor to the Debtor more than 20 years ago and subsequently

sold to an unaffiliated third party.  The ECL Technology is a proven successful detection

method, as nearly 1 billion assays are run each year on the ECL Technology.  The ECL

Technology is crucial to the Debtor's business, as it is the detection system for all of the Debtor's

assays.

## PDL CREDIT FACILITY

11.     The Debtor is working toward obtaining FDA approval of the Debtor's

diagnostics system for the above-mentioned assays.  The Debtor also has many other potential

assays either in early stage development or ready to initiate early stage development.  Because

administering the necessary trials to obtain FDA approval is very expensive and time-

consuming, the Debtor sought to borrow money to fund ongoing development of its diagnostic

system and assays, including the costly regulatory approval process.

12.     Therefore, the Debtor entered into a senior secured $40 million term loan

facility (the "**PDL Facility**") on November 2, 2012, with PDL BioPharma, Inc. ("**PDL**"), an

entity which provides capital and financing solutions to late stage public and private healthcare

companies.[3]  The PDL Facility accrued interest at the rate of 5.00% per year and also afforded

PDL certain royalty payment rights generated by the sale, distribution, or other use of the

Debtor's products (if any).  Pursuant to the terms of that certain Security Agreement, dated as of

November 2, 2012 (the "**Security Agreement**"), among the Debtor and PDL and that certain

Patent Security Agreement, dated as of November 2, 2012, among the Debtor and PDL, PDL has

a first-priority lien on, among other collateral, all patents and patent applications of the Debtor as

well as all of its deposit accounts, cash, receivables, equipment, and fixtures.

13.    Given the time the Debtor required to obtain FDA approval and

subsequently raise the necessary funds to repay the financing provided under the PDL Facility,

the PDL Facility provided that the Debtor could elect to pay interest which accrued in kind,

meaning that at the Debtor's option, no principal or interest payments were due until year-end

2017 (or, alternatively, year-end 2021 if the Debtor's 2017 revenue exceeds approximately

$127 million).[4]

14.    However, on January 22, 2013, just a few months after the PDL Facility

was put in place, PDL sent a notice of default and acceleration to the Debtor, demanding

immediate payment on the entire PDL Facility, asserting that an event of default arose under the

PDL Facility when the Debtor used loan proceeds to pay certain intercompany claims.  As the

Debtor was unable to repay the entire accelerated loan amount, on February 28, 2013, it entered

into a forbearance agreement (the "**Forbearance Agreement**") requiring the Debtor to obtain an

---

[3]    A portion of the proceeds of the PDL Facility was used to satisfy pre-existing obligations of Mr. Wohlstadter and I to PDL.

[4]    Concurrently with the Debtor's entry into the PDL Facility, Mr. Wohlstadter and I executed a Guarantee and Pledge Agreement.  This agreement pledged our equity interests in the Debtor as collateral and provided a non-recourse guarantee of the PDL Facility.

additional $15 million in financing.[5]  In order to comply with the terms of the Forbearance

Agreement, on August 1, 2013, the Debtor obtained a $15 million loan (the "**White Oak Loan**")

from White Oak Capital Advisors ("**White Oak**").  White Oak and PDL entered into an

intercreditor agreement in connection with the White Oak Loan.  The White Oak Loan was

subsequently satisfied in full on September 9, 2015, and White Oak released all liens it held

against the Debtor's assets in connection with the White Oak Loan.

15.     On August 15, 2013, the Debtor and PDL entered into an Amended and

Restated Credit Agreement (as subsequently amended, the "**Restated Credit Agreement**")

which restated the Debtor's obligations to PDL under the PDL Facility.  The Restated Credit

Agreement was subsequently amended when PDL asserted that the Debtor was not paying its

debts as they came due, as required by the Restated Credit Agreement.  However, the Debtor

continues to dispute that a default arose under the Restated Credit Agreement.

## DEBTOR'S RECEIVERSHIP

16.     On August 7, 2014, PDL issued a notice of default to the Debtor, alleging

that the Debtor (i) failed to pay its debts as they came due and (ii) failed to engage an investment

banker to market its assets or obtain additional financing sufficient to continue the Debtor's

operations and pay all obligations under the PDL Facility, as required by an amendment to the

Restated Credit Agreement, each an alleged default under the Restated Credit Agreement.

Shortly thereafter, on September 24, 2014, PDL filed a petition in the Circuit Court for

Montgomery County, Maryland (the "**Maryland Court**") (Case No. 395722V) requesting the

---

[5]     In connection with the Forbearance Agreement, Mr. Wohlstadter and I also signed an amended guarantee
agreement on behalf of ourselves and another guarantee on behalf of the Wellstat Affiliates guaranteeing
the payment of the Debtor's obligations set forth under the PDL Facility, but only until $15 million was
deposited into the Debtor.  These guarantees were subsequently extinguished under the terms of the
Restated Credit Agreement (as defined below).  However, PDL disputes the extinguishment of the
guarantees and their continuation and validity are currently the subject of litigation.

appointment of a receiver for the Debtor, alleging that the Debtor was in default of the Restated

Credit Agreement. The receivership proceeding was instituted pursuant to a provision in the

Security Agreement that permitted a receiver to be appointed with respect to the collateral of

PDL during the continuance of an event of default under the Security Agreement. The

receivership is not being conducted pursuant to any applicable state receivership law but is

instead premised on enforcing the contractual provisions of the Security Agreement.

17.      On the same day the petition was filed, the Maryland Court, on an *ex parte*

basis with no representative of the Debtor in attendance, appointed Gray & Associates, LLC (the

"**Receiver**"), an entity hand-selected by PDL, as receiver for the Debtor's property.

Subsequently, during the course of the Debtor's receivership, PDL continued to provide loan

advances to the Debtor under the Restated Credit Agreement.

18.      Subsequent to the appointment of the Receiver, on or around December

2015, the Receiver implemented a staffing plan which reduced the Debtor's employees from 33

to 10 on or about that date. In fact, the Receiver and PDL would have terminated all of the

Debtor's employees as of December 1, 2015 if additional funding had not been provided by Mr.

Wohlstadter and me to allow the Debtor's operations to continue.

19.      On August 5, 2015, the Maryland Court approved sales procedures

requested by the Receiver for the sale of substantially all of the Debtor's assets.

20.      On November 19, 2015, Mr. Wohlstadter and I approached the Receiver

offering to fund the Debtor's operational costs through June 30, 2016 in order to provide

additional time to pursue a strategic transaction with various investment institutions and

biopharma companies, several of which had expressed an interest in pursuing such a transaction

with the Debtor, but these companies were not among those which were approached by the Receiver as part of its sales process.

21.     The Receiver declined our offer because PDL did not consent to such an extension, and on November 23, 2015, the Receiver filed a motion with the Maryland Court seeking to sell the assets of the Debtor to PDL for a credit bid of $5 million, asserting that no third party bidders submitted qualified bids under the sale procedures.  On December 10, 2015, the Debtor filed an objection to the proposed sale on the grounds that (i) the Receiver was hand-selected by PDL, has acted for PDL's sole benefit and has repeatedly refused the Debtor's discovery requests into the relationship between the Receiver and PDL during the course of the receivership proceeding, (ii) that the sale process employed by the Receiver was fundamentally deficient in a number of respects, as described further below and (iii) that the proposed purchase price of a $5 million credit bid by PDL fundamentally undervalues the Debtor's assets and would provide no consideration to the Debtor's creditors other than PDL.  The Maryland Court has scheduled a hearing on the proposed sale for April 13, 2016.

22.     I believe that a sale of substantially all of the Debtor's assets for a $5 million credit bid is clearly not fair value for the Debtor's assets given that PDL's own public filings with the Securities and Exchange commission disclose that the Debtor's assets are worth over $50 million.[6]  My belief in this regard is bolstered by an expert report which was submitted in the Maryland Court by a senior managing director of Teneo Restructuring ("**Teneo**"), a consultant retained by the Debtor.  I also believe that the sale process employed by the Receiver was dominated by PDL, who hand-selected the Receiver.  The sales and marketing process conducted by the Receiver was critically flawed due to a variety of factors, including:

---

[6]     PDL BioPharma, Inc., Annual Report (Form 10-K) (Feb. 23, 2016), 74-75 (carrying value of $50.1 million for the Debtor's assets as of December 31, 2015).

- The Receiver's marketing process primarily centered around clinical diagnostics uses of the Debtor's technology; the Debtor's technology has other significant uses, including research and development, agricultural biotechnology and veterinary uses, but none of those uses were explored by the Receiver.

- The Receiver did not even attempt to contact over a dozen potential strategic buyers which would have required the consent of BioVeris for a transaction pursuant to a sales restriction in the ECL License, or other potential strategic buyers that were not subject to the sales restriction.

- The Receiver's limited marketing process only resulted in two parties which signed a non-disclosure agreement, despite a number of strategic buyers indicating their interest to Mr. Wohlstadter and me.

- The Receiver and its advisors did not complete a formal or informal valuation of the Debtor's assets.

- The dissemination by the Receiver to interested parties of bid-chilling "valuation" reports commissioned by PDL which severely undervalued the Debtor's assets.

- The Receiver's failure to analyze the validity of PDL's asserted secured claim or to investigate counterclaims against PDL.

- The proposed sale cannot maximize the value of the Debtor's assets due to certain restrictions under the ECL License, which I understand may not be applicable in a chapter 11 reorganization.

- The advisors retained by the Receiver to pursue the sale do not have sufficient expertise in the Debtor's industry of biopharma and diagnostics to properly conduct a marketing process and sale.

- The Receiver and its investment bankers intentionally excluded Mr. Wohlstadter and me, the parties with the most knowledge about the Debtor's assets and technology, from participating at all in the sale and marketing process.

- The Receiver's discontinuation of the development of certain potentially lucrative cancer assay-programs.

23.     I believe that conducting a full marketing process, either for a sale of the

Debtor's assets or for a new investor to participate in a reorganization plan, is the best way to

maximize value for the Debtor's stakeholders, and would provide significantly more value than

the critically deficient sales process run by the Receiver for the sole benefit of PDL.

24.     To that end, the Debtor engaged Teneo, a financial advisory firm that I believe, with the input of Mr. Wohlstadter and I, will be much better-positioned than the Receiver to run a comprehensive marketing process which is more likely to result in a fair value offered for the Debtor's assets.

## ANTICIPATED MOTIONS

25.     The Debtor has not filed "first day" motions concurrently with its chapter 11 petition. However, the Debtor anticipates that in the coming days it will file (i) a motion seeking court approval of an unsecured debtor-in-possession financing facility to be provided by its affiliate, Wellstat Management Company, LLC, in order to provide sufficient liquidity for the Debtor to operate its business in chapter 11 and fund professional fees, (ii) a motion seeking court approval of the Debtor's continued use of its prepetition cash management system and bank accounts, and (iii) certain administrative "first day" motions.

## INFORMATION REQUIRED BY LOCAL RULE 1007-2

26.      It is my understanding that Local Rule 1007-2 requires certain information related to the Debtor, which is set forth below.

27.     Exhibit A hereto provides that to the best of the Debtor's knowledge, as of the Petition Date, no *ad hoc* committees have been formed.

28.     Exhibit B hereto provides the following information with respect to the single holder of secured claims against the Debtor:  (a) the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address) and telephone number; (b) the amount of the claim; (c) a brief description of such creditor's claim; (d) if known, an estimate of the value of the collateral securing the claim; and (e) whether the claim or lien is contingent, unliquidated or disputed.

29.     Exhibit C hereto provides a summary of the Debtor's assets and liabilities.

30.     <u>Exhibit D</u> hereto provides that the outstanding equity interests of the

Debtor are privately held, and that there is no established public trading market for such equity

interests or the Debtor's debt securities.

31.     <u>Exhibit E</u> hereto sets forth a list of the property of the Debtor in the

possession or custody of a custodian, public officer, mortgagee, pledge, assignee of rents, or

secured creditor, or agent for any such entity.

32.     <u>Exhibit F</u> hereto sets forth a list of the owned or leased premises from

which the Debtor operates its businesses.

33.     <u>Exhibit G</u> hereto sets forth the location of the Debtor's substantial assets

and the location of its books and records.

34.     <u>Exhibit H</u> hereto sets forth the nature and present status of each action or

proceeding, pending or threatened, against the Debtor or its property where a judgment or seizure

of its property may be imminent.

35.     <u>Exhibit I</u> hereto provides a list of the names of the individuals who

comprise the Debtor's existing senior management, their tenure with the Debtor and a brief

summary of their relevant responsibilities and experience.

36.     <u>Exhibit J</u> hereto sets forth the estimated amount to be paid to:

(a) employees; (b) officers, stockholders and directors; and (c) financial and business consultants

retained by the Debtor, for the thirty (30) day period following the Petition Date.

37.     <u>Exhibit K</u> hereto sets forth a list of the Debtor's estimated cash receipts

and disbursements, net gain or loss, and obligations and receivables expected to accrue that

remain unpaid, other than professional fees, for the thirty (30) day period following the Petition

Date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  April 12, 2016
        New York, New York

                        Defined Diagnostics, LLC
                        Debtor and Debtor in Possession


                        /s/ Nadine H. Wohlstadter
                        NADINE H. WOHLSTADTER
                        Managing Member of
                        Debtor and Debtor in Possession

## EXHIBIT A

### Committees Organized Prior to the Order for Relief

To the best of the Debtor's knowledge and pursuant to Local Rule 1007-2(a)(3), as of the Petition Date, there are no *ad hoc* groups.

**EXHIBIT B**

**Holder of Secured Claims Against the Debtor[1]**

| Creditor[2] | Mailing Address and Phone Number | Approximate Amount of Claim[3] (in millions) | Description of Security Interest | Contingent, Unliquidated, Disputed (C/U/D) |
|---|---|---|---|---|
| PDL BioPharma, Inc. | 932 Southwood Blvd, Incline Village, NV 89451 / (775) 832-8500 | Approximately $94,100,000[4] | First-priority security interest in substantially all of the assets of the Debtor. | D |

---

[1]  The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.  In addition, nothing contained herein shall constitute a waiver of any claims, defenses or counterclaims that the Debtor may hold in respect of such claims or the holders thereof.

[2]  The Debtor is only aware of a single secured creditor.

[3]  This amount is as of December 31, 2015 and is inclusive of principal and accrued interest.

[4]  The amount listed is the amount asserted by PDL BioPharma, Inc. in its most recent Form 10-K (Feb. 23, 2016) and is disputed (at least in part) by the Debtor.

## Defined Diagnostics (f/k/a Wellstat
## Diagnostics) Balance Sheet
## As of December 31, 2015

| Description | Amount |
|---|---|
| **Current Assets** | |
| Cash and Cash Equivalents | $ 156,687 |
| Accounts Receivable | 500 |
| Prepaid | 108,051 |
| Advances to Suppliers | - |
| Other Current Assets | 4,969 |
| **Current Assets** | 270,206 |
| | |
| Noncurrent Assets | |
| Fixed Assets | |
| Cost | $ 2,218,318 |
| Accumulated Depreciation | (907,042) |
| NonCurrent Deposits | 655 |
| Intangible-License Agreement | 2,927,000 |
| Intangible-Accum Amort License | (2,488,591) |
| **Noncurrent Assets** | 1,750,340 |
| | |
| **Assets** | **$ 2,020,546** |
| | |
| Liabilities and Stockholders' Equity | |
| Current Liabilities | |
| Accounts Payable-Trade | $ 447,904 |
| Affiliates Payable | 28,245 |
| Accrued Vacation | 25,611 |
| Accrued Expenses | 9,212 |
| Deferred Rent | 24,248 |
| **Current Liabilities** | 535,219 |
| | |
| Notes Payable | |
| Notes Payable - PDL | $ 64,687,348 |
| Notes Payable to Owners | 53,615,632 |
| Intercompany Settlements | 5,981,885 |
| Deferred Rent | 4,434 |
| **Noncurrent Liabilities** | 124,289,299 |
| | |
| Stockholders' Equity | |
| Retained Earnings (Deficit) | $ (122,803,972) |
| **Stockholders' Equity** | (122,803,972) |
| | |
| **Liabilities and Stockholders' Equity** | **$ 2,020,546** |

## <u>EXHIBIT D</u>

### Publicly Held Securities

Local Bankruptcy Rule 1007-2(a)(7) requires the Debtor to identify the number and classes of shares of stock, debentures and other securities of the Debtor that are publicly held and the number of holders thereof, listing separately those held by each of the Debtor's officers and directors and the amounts so held.

The outstanding equity interests of the Debtor are privately held, and there is no established public trading market for such equity interests. The Debtor has not issued debt securities.

## EXHIBIT E

### Debtor's Property Not in the Debtor's Possession

Local Bankruptcy Rule 1007-2(a)(8) requires the Debtor to list property in the possession or custody of any custodial, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or agent for any such entity.

Substantially all of the assets of the Debtor are currently under the control and/or possession of the following entity, which was appointed as receiver of the Debtor's property by the Circuit Court for Montgomery County, Maryland (*PDL BioPharma, Inc. v Wellstat Diagnostics, LLC*, Case No. 395722V):

Gray & Associates, LLC
401 Headquarters Drive, Suite 205
Millersville, MD 21108
(Phone): 410-729-8822

## EXHIBIT F

**Debtor's Premises**

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtor operates its business.

| Address | Type of Interest[1] |
|---|---|
| 930 Clopper Road, Gaithersburg, Maryland 20878 | Leasehold interest.  The Debtor shares this facility with the Wellstat Affiliates. |

---

[1] The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtor.

## EXHIBIT G

Pursuant to Local Rule 1007-2(a)(10), the following lists the location of the Debtor's substantial assets, books and records, and nature, location, and value of any assets held by the Debtor outside the United States:

### Location of Debtor's Substantial Assets

Defined Diagnostics, LLC
930 Clopper Road
Gaithersburg, Maryland 20878

Gray & Associates, LLC
401 Headquarters Drive, Suite 205
Millersville, MD 21108

License Agreement with BioVeris Corporation, which is governed by New York law and has a New York venue provision.

### Location of the Debtor's Books and Records

Defined Diagnostics, LLC
930 Clopper Road
Gaithersburg, Maryland 20878

Gray & Associates, LLC
401 Headquarters Drive, Suite 205
Millersville, MD 21108

### Debtor's Assets Outside of the United States

None

## EXHIBIT H

**Summary of Actions or Proceedings Pending Against the Debtor**

Pursuant to Local Rule 1007-2(a)(11), there is a receivership proceeding pending against the Debtor which is captioned *PDL BioPharma, Inc. v Wellstat Diagnostics, LLC*, which is currently pending in the Circuit Court for Montgomery County, Maryland (Case No. 395722V).

The Debtor may also be involved in other pending or threatened litigations where a judgment against the Debtor is not imminent. The Debtor will provide information regarding pending or threatened litigations in the Debtor's Statement of Financial Affairs and/or Schedules of Liabilities, as applicable.

<u>**EXHIBIT I**</u>

**Senior Management of the Debtor**

| Name | Tenure | Position | Experience/Responsibilities |
|------|--------|----------|-----------------------------|
| Sam Wohlstadter | Founder | Chief Executive Officer | Founder of Igen and BioVeris, which were predecessors to Defined Diagnostics, LLC, prior to selling both companies for a combined amount of roughly $2 billion.  Is involved in the decision processes for business development and development of key programs. |
| Nadine Wohlstadter | Founder | Managing Member | Key personnel directly report to the Managing Member.  Oversees program development funding and hiring.  Directly involved in capital financing and business development transactions. |

# EXHIBIT J

## Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of payroll to the Debtor's employees (excluding officers, directors, and stockholders) and the estimated amount to be paid to officers, directors, stockholders, and financial and business consultants for the thirty (30) day period following the filing of the chapter 11 petition.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors and Stockholders)[1]** | $24,763.56 per week |
| **Payments to Officers, Directors, and Stockholders** | None |
| **Payments to Financial and Business Consultants** | Approximately $50,000-60,000[2] |

---

[1]     Amount includes estimated employee wages and salaries, payroll taxes and other various benefits.

[2]     Amount includes estimated fees only, including fees which may be paid to professionals whose retentions and fee applications must be approved by the Court.  Amount does not include expenses, which may ultimately be passed through to the Debtor by such consultants.  Further, the amount does not include estimated payments to auditors or ordinary course professionals, or any payments to advisors retained by other parties who do not represent the Debtor whose costs may be passed along to the Debtor.

**<u>EXHIBIT K</u>**

**Debtor's Estimated Cash Receipts and Disbursements for the
Thirty (30) Day Period Following the Filing of the Chapter 11 Petition**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the Debtor's chapter 11 petition, the estimated cash receipts and disbursements, estimated net cash gain or loss, and estimated obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $0 |
| **Cash Disbursements** | Approximately $113,000 |
| **Net Cash Gain/Loss** | ($113,000) |

| | |
|---|---|
| **Unpaid Obligations** | $0 |
| **Uncollected Receivables** | $0 |

## EXHIBIT L

**Corporate Organizational Chart of Debtor and Wellstat Affiliates**

